# CHARLESTON.

BANK *et al v.* BRYAN *et al.*

Submitted June 14, 1911.   Decided February 18, 1912.

1.   PRINCIPAL AND AGENT—*Rights as 'to Third Parties—Authority of Agent—"Promissory Notes."*

Power of attorney given an agent to purchase shares of stock in corporations, "formed or to be formed," and to pay for same by "promissory notes," payable at such time and place as the agent may determine, authorizes such agent to purchase stock in a newly formed corporation, and to execute his principal's commercial notes therefor. (p. 35).

2.   BILLS AND NOTES—*Rights on Indorsement to Bona Fide Holders.*

Such notes are collectible by an indorsee for value and without notice, who, relying upon the agent's authority,· purchased them before maturity, notwithstanding the authority of the agent was procured by the fraudulent misrepresentations of a third person, and the stock for which they were given was worthless. (p. 40).

3.   CORPORATIONS—*Functions and* |*Dealings—Indorsement of Negotiable Instruments.*

A coporation owning negotiable notes made payable to its order, in consideration for capital stock to be issued to the maker of the notes, has a right to sell them. (p. 41).

4.   BILLS AND NOTES—*Defenses—To Whom· Available.*

In a suit by the indorsees of such notes, against the maker, it is no defense that the treasurer who indorsed them for his corporation lacked authority, the corporation itself not complaining and having no right to complain of his act. .(p. 41).

5.   SAME—*Actions—Defenses.*

Neither can he defend on the ground that one bank, without authority to do so, indorsed them for the accommodation of another· that discounted them. (p. 37).

6.   BANKS AND BANKING—*Functions and Dealings—Notice to Officer or Director.*

Knowledge of the infirmity of commercial paper, acquired by an officer or director of a bank,. outside of his official duties, who is personally interested in having the paper discounted, is not attributable to the bank. (p. 36).

72 W. Va.

7.  PRINCIPAL AND AGENT—*Authority of Agent—Effect of Wrongful Acts.*

    Promissory notes executed by an agent pursuant to authority, but which contain a provision that the agent is not authorized to make, empowering any attorney-at-law to appear in any court of record, in the state where payable, and waive issuance and service of process and to confess judgment against the maker, are not void because of such unauthorized provision.  (p. 38).

8.  BILLS AND NOTES—*Certificates of Deposit—Negotiability.*

    Certificates of deposit, payable to the order of the depositor, are negotiable, and are governed by the law applicable to commercial paper.  (p. 39).

9.  SAME—*Rights on Indorsement—Bona Fide Purchasers.*

    Mere suspicion of its infirmity, by the purchaser for value and in due course of commercial paper, is not evidence of bad faith.  (p. 39).

10. APPEAL AND ERROR—*Presenting Question in Trial Court—Variance.*

    A variance between the allegation and proof, not called to the attention of the lower court by any means, if not so great as to show distinct causes of suit, will be treated by this Court as having been waived.  (p. 42).

11. FRAUDULENT CONVEYANCES—*Transaction Invalid—Inadequacy of Consideration—Conveyance Between Parent and Child.*

    A sale and conveyance by one greatly indebted, of a material portion of his property, to a child for a consideration so grossly inadequate as to shock the moral conscience, is evidence of a fraud upon the creditors attacking such conveyance.  (p. 43).

12. SAME.

    A conveyance of property worth $300,000, yielding an income of $2,000 per month, made to his daughter, by a father largely indebted, in consideration of only $20,000, held to be fraudulent and void as to creditors attacking it, for inadequate consideration and for other reasons.  (p. 43).

Appeal from Circuit Court, Marion County.

A bill in equity by the City Bank of Wheeling and others against W. J. Bryan and others.  From a decree for defendants, plaintiffs appeal.

*Reversed and Remanded.*

*Alfred Caldwell, T. S. Riley, Henry M. Russell, John J. Coniff,* and *Erskine & Allison,* for appellants.

*W. S. Meredith, J. Howard Holt, P. M. Hoge, D. S. Walton,* and *W. A. Hook,* for appellees.

WILLIAMS, JUDGE:

This appeal is by the First Citizens Bank of Cameron, City Bank of Wheeling, and the Merchants & Manufacturers National Bank of Columbus, Ohio, from a decree rendered on the 22nd of January, 1910, by the circuit court of Marion county, in four several suits brought by them, respectively, against W. J. Bryan and others, for the purpose of collecting a number of notes held by them as indorsees, aggregating $99,000. The several suits were consolidated and heard together. Two of them are by the First Citizens Bank, some of the notes held by it not being due at the time it brought its first suit; and one suit each by the other two banks. All of them are attachment suits in equity attacking a conveyance made by W. J. Bryan to his daughter, Mrs. Lizzie B. Loller, on the alleged ground that it was made to hinder, delay, and defraud plaintiffs in the collection of their debt. Mr. Bryan's non-residency is also averred. The suits were brought in the latter part of 1903 and early part of January 1904. During their pendency W. J. Bryan died, and they were revived against his administrator.

W. J. Bryan was the owner in fee of 474 acres of valuable coal land in Marion county, West Virginia, which was being operated for coal, under a lease from him to the Fairmont Coal Company. That company was garnished as his debtor; and it appears from its answer filed in the suits that the royalties accruing to Bryan on account of coal being mined amounted to $2,000, or more, per month.

As to one note for $6,000 sued on by the First Citizens Bank on which there is a balance of $1,000, exclusive of interest, there is no controversy. The court gave a decree for this balance and its interest, but dismissed the suit as to the other notes sued on; and also dismissed the suits of the other two banks. All the notes, excepting the $6,000 note, and the $3,000 note held by the First Citizens Bank, were executed by S. W. Loller

attorney in fact for W. J. Bryan. Loller is Bryan's son-in-law; and the power of attorney clothed him with power, among other things, "3. To indorse in my name or negotiate all checks, drafts, bills of exchange, notes or other negotiable paper, payable to me or my order, or which may require my indorsement, and to deposit the proceeds in my name in said First Citizens Bank of Cameron, W. Va., or in any other bank or banks, trust company or companies wherever located that my said attorney may from time to time select; and to make, draw, or sign in my name any promissory notes which my said attorney shall in his absolute discretion deem requisite in or about my business.

*    *    *  . *.  *    *    *    *    *    *    *    *    *    *    *    *    *    *

"To subscribe for or purchase in my name shares of the Capital stock of any company or companies, formed or to be formed, and to pay for said shares of stock in cash or by promissory note or notes payable at such time and in such manner as my said attorney shall in his absolute discretion determine."

One who deals with an agent is bound to take notice of the extent of his authority. There is no question, however, that Loller was empowered to execute promissory notes for Mr. Bryan, for the purpose of buying stock in corporations then existing, or thereafter to be formed; and it is clearly established by the proof that all the notes in question, except one for $3,000, held by the First Citizens Bank, were executed in consideration for stock purchased for Bryan in certain corporations. $50,000 in notes were executed on the 10th of June, 1903, payable to the Loller Manufacturing Company, for stock in that company. It had been chartered by the secretary of state of West Virginia, six days before.

Notes aggregating $47,000 were executed on July 16, 1903, payable to S. A. Englehard for stock in the American Manufacturing Company, a then existing corporation.

One other note for $3,000, held by the First Citizens Bank belongs to a class of notes aggregating $90,000 which were executed on the 10th of August, 1903, by W. J. Bryan in person. The $3,000 note was payable to S. A. Englehard; the others were payable to Benedum and Fox, and were executed for the purchase of stock held by A. E. Fox, E. C. Fox, his brother, and

M. L. Benedum in the American Manufacturing Company. This $3,000 note is the only one of that class involved in this suit.

Following is a brief history of the transactions leading up to the execution of the notes. One. E. K. Ascher had invented a tank and valve for use in water closets to be operated under low water pressure; and had applied for a patent. In January, 1903, a plumbing company, the Fox Tank and Valve Company, was chartered for the purpose of exploiting this device; and W. J. Bryan was induced to take $12,000 of stock in it. The $1,000, not controverted, is the balance of that subscription. At the time that subscription was made the Fox Tank and Valve Company owned nothing but the right to the invention, which Ascher had assigned to it. The patent was later issued to said company. W. J. Bryan was the president of that company. Later, the Loller Manufacturing Company was chartered for the purpose of taking over the stock and business of the Fox Tank and Valve Company, and enlarging the business of manufacturing and selling the device. S. W. Loller was made president, and A. E. Fox, treasurer, of that company.

The $47,000 of notes were executed in consideration of stock in the American Manufacturing Company. It owned a plant, located at Middleport, Ohio, and had been engaged in manufacturing plumbing fixtures. S. A. Englehard owned and controlled nearly all the stock of that company. It appears that the American Manufacturing Company was then insolvent; it owed debts amounting to $56,000, and its plant was sold some time after, under decree of court, and brought about $17,000.

On the 15th of July, 1903, A. E. Fox and M. L. Benedum met S. A. Englehard at Pomeroy, Ohio, and took from him an option on the property and stock of the American Manufacturing Company, at $96,000, out of which the debts, estimated not to exceed $56,000, were to be paid. They agreed to pay cash, or to execute satisfactory notes for the remaining $40,000, in the event the option was closed. On the day following, A. E. Fox and M. L. Benedum went to Middleport, Ohio, and met S. W. Loller who had gone there before them to look over the plant. Notwithstanding they then held an option to buy the property at $96,000 they made Loller believe that it was worth $150,000, and combined and conspired with Englehard in

selling it to Loller and themselves at that price. The debts, $56,000, were assumed, and the balance of $94,000 was settled for by Loller executing Bryan's notes for $47,000, payable to S. A. Englehard, and by A. E. Fox, E. C. Fox, his brother, and M. L. Benedum giving their pretended checkc for $47,000, which were immediately thereafter returned to them by Englehard. Loller knew of the debts owing by the American Manufacturing Company, but evidently he had no knowledge of the value of its plant. Indeed, it appears from the record that he had little, if any, business qualifications, and seems only to have been an unwitting tool in the hands of Fox and Benedum in carrying out their scheme to defraud the old man Bryan. The court below found, and we think rightly so, that all of these notes had been procured by fraudulent means, and would not be collectible if still in the hands of the payee. It is unnecessary to state the evidence in support of this conclusion. The record abounds with it. The facts already stated indicate the character of the transactions. But the notes are commercial paper, and have been negotiated by the payee to the several plaintiffs who claim to have acquired title to them before maturity, in due course, and without notice of their infirmity. If such is the case then they are not subject to the equities in favor of the maker.

The First Citizens Bank holds seven notes aggregating $26,000, as to all of which Mr. Bryan denied liability, except the balance due on the $6,000 note, for which, together with accrued interest, a décree was given. Four of the contested notes are for $5,000 each, and bear date June 10, 1903, and are payable at the Merchants & Manufacturers National Bank, to the order of the Loller Manufacturing Company; one note for $2,000, dated July 16, 1903, payable at the Middleport Bank to the order of S. A. Englehard, all signed by W. J. Bryan by S. W. Loller attorney in fact; and one for $3,000, dated August 10, 1903, payable at the First Citizens Bank to the order of S. A. Englehard, and signed by W. J. Bryan in person.

Two principal defenses are made to all those notes, viz.: (1) That S. W. Loller was not authorized to execute them; and (2) that the notes were procured to be executed by fraud, and that the banks had constructive knowledge of it at the time they

purchased them, and are, therefore, not innocent holders.   The banks were bound to take knowledge of the extent of Loller's authority, because he was only an agent; and an agent can not bind his principal by exceeding his authority.   But the power of attorney authorized Loller to buy stock in any corporation, formed or to be formed, and in consideration thereof to execute W. J. Bryan's promissory notes; and it is clearly proven that all the notes executed by Loller were given in consideration for stock in corporations.   The $50,000 of notes, executed on the 10th of June, were for stock in the Loller Manufacturing Company; and the $43,000 of notes now held by the Merchants & Manufacturers National Bank were given for stock of the American Manufacturing Company.

It is urged that Loller had not power to execute negotiable notes.   But to so interpret the power of attorney would be to give a restricted meaning to the word "promissory," not warranted by anything contained in the writing, and clearly not warranted in law.   A promissory note may, or may not be negotiable, but a negotiable note is necessarily a promissory note; and the same note might be negotiable in one state and not technically negotiable in another.   Its quality as  commercial paper would depend upon the law of the place of payment. The word "promissory", as applied to notes, is used in a generic sense, while the word "negotiable" simply defines a particular class of that *genera*.   The greater term necessarily includes the less.   The power authorized Loller to execute "promissory note or notes payable at such time and in such manner as my said attorney shall in his absolute discretion determine."    This language is comprehensive enough to give him power to execute any kind of a promissory note and make it payable anywhere. All the notes in question were either dated at McCracken, Pennsylvania, or at Middleport, Ohio, and most of them were payable in the latter state; so that, as to their negotiability, most of them are governed by the laws of Ohio.   · 4 Min. Inst. 614.

Are the several plaintiffs innocent holders?   That they purchased the notes before maturity and paid value for them, is clearly proven.   But were they ignorant of the fraud perpetrated on Mr. Bryan by M. L. Benedum, A. E. Fox and Englehard in

procuring them to be executed? If not, then they are not inno-
cent holders, although they paid full value.

First, as to the notes held by the First Citizens Bank: Four
of them, aggregating $20,000, are a part of the $50,000 of notes
that were made on the 10th of June, payable to the order of
the Loller Manufacturing Company. They were indorsed by
that company by A. E. Fox treasurer, and were taken by him to
the Bank of Wheeling for discount. That bank would not
discount them until indorsed by the First Citizens Bank, which
was done; and the funds were placed to the credit of the Loller
Manufacturing Company in the First Citizens Bank, and were
later checked out by A. E. Fox as treasurer of the said company.
The notes being payable at the Merchants & Manufacturers
National Bank were forwarded to it for collection, and, not
being paid, were protested. They were then taken up by the
First Citizens Bank.

M. L. Benedum and A. E. Fox were president and cashier,
respectively, of the First Citizens Bank; and it is insisted that,
because of their official relation to the bank, it is affected with
constructive knowledge of their participation in the fraudulent
procurement of the notes, and is, therefore, not an innocent
holder. The officers and directors of a bank are its agents, and,
as a general rule, knowledge acquired by an agent in respect to
matters pertaining to the agency is attributable to his principal.
But there is an exception to this rule in respect to an officer or
member of a board of directors of a corporation, who has
acquired knowledge outside of his official duties, which it is to
his personal interest to conceal from his corporation. When
such is the case, his knowledge will not be ascribed to the corpo-
ration of which he is an officer. This exception is especially appli-
cable in the case of an officer of a bank, who has a personal interest
to be served in having paper discounted by it. This point was
decided by this Court in *Bank* v. *Lowther-Kaufman Oil & Coal
Co.,* 66 W. Va. 505, in which we held that: "Notice to one of
the directors of a matter affecting the interest of the bank
which it is to the interest of such director to conceal is not notice
to the bank." The same principle was again announced in the
more recent case of *Bank of Bluefield* v. *Ritz,* 70 W. Va. 409.
We deem it unnecesary to repeat the reason for the rule, but

simply refer to the opinions in those cases. Fox and Benedum were both stockholders in the Loller Manufacturing Company, and were personally interested in having the notes discounted; and for that reason the law does not attribute their knowledge to the bank of the infirmity of the notes, acquired by them while acting for the Loller Manufacturing Company. There are other stockholders in the bank, innocent of any wrong doing, whose rights deserve to be protected.

It is urged that the First Citizens Bank did not negotiate the notes to the Bank of Wheeling, but that it only indorsed them for accommodation; that it had no power to make such indorsement and is not bound thereby; and that it purchased the notes after they became due, and is therefore not entitled to claim protection against the equities in favor of the maker. But the transaction between the two banks was treated as one of sale and purchase; the Bank of Wheeling turned the funds over to the First Citizens Bank, and it placed them to the credit of the Loller Manufacturing Company. It was evidently regarded by the two banks as a re-discounting of the paper; and being so considered by them, the maker of the notes has no right to complain; it was a matter between the banks. Our conclusion is that the First Citizens Bank is not affected with notice of the infirmity of the four $5,000 notes. The same argument applies in support of the bank's title to the $2,000 note. It was one of the class of $47,000 notes, dated July 16, 1903, and was discounted by the Merchants & Manufacturers National Bank after having been indorsed first by Englehard, the payee, and then by the First Citizens Bank. After being protested, it was taken over by the First Citizens Bank.

The other note for $3,000 was discounted by the First Citizens Bank for Englehard, the payee. For the reason above given the bank is not affected with notice of its infirmity. It is one of the class of $90,000, and the only one of that class involved in these suits. Those notes were made by Mr. Bryan in person at the solicitation of Mr. Englehard, and were given for the purchase of Benedum and Fox's interest in the American Manufacturing Company. Some of those notes were signed in blank by Mr. Bryan and were filled out afterwards by Englehard. Benedum and Fox agreed to give Englehard $8,000 for selling

their interest to Mr. Bryan; and this $3,000 note was taken by him as a part of his commission for the valuable services he had rendered in assisting them to unload upon old man Bryan, at the price of $90,000, their interest in the American Manufacturing Company, which they had shortly before acquired, through the machinations of themselves and Englehard, for nothing, by giving their pretended checks to Englehard for $47,000, but which he immediately returned to them, after Loller had executed Bryan's notes for a like sum. Of course Benedum and Fox were interested in concealing the infirmity of the note from the bank. The note was used to discharge, in part, their own obligation to Englehard.

As to the suit by the Merchants & Manufacturers National Bank: We have already mentioned the circumstances under which the $43,000 of notes held by this bank were executed. They are of the class of $47,000 which were executed by Bryan, by his attorney in fact, for the purchase of Englehard's stock in the American Manufacturing Company at Middleport. They were all made payable to the order of Englehard at the Middleport Bank. They were negotiable notes executed in consideration of stock in a corporation; and we have said that Loller had power to execute commercial notes for such a purpose. But these are what are known as judgment notes; that is, they contained a provision authorizing any attorney-at-law to appear for Bryan, in any action on the notes, in any court of record in the State of Ohio, and to waive issuance and service of process, and to confess judgment in favor of the holder. It is insisted that this provision, inserted in the notes, was in excess of authority, and that it avoids the notes. It is clearly without authority, and renders the provision in question void. But does it affect the promise to pay the note itself? We think not. It does not follow that, because some provision in a written instrument is void, the whole is thereby rendered nugatory. The power to confess judgment, which Loller attempted to confer, was not to be exercised unless the note was not paid at maturity. It has nothing to do with the consideration or the promise to pay. It relates wholly to the collection of the notes, to the remedy; and may be regarded as harmless surplusage. The legal proposition here presented was decided in *Robinson* v. *Lowe,* 50 W.

Va. 75. In that case the agent was authorized to execute a quit claim deed for land; and instead, he executed a deed of conveyance with general warranty. It was urged that the deed was void because it was in excess of the agent's authority. But the. Court held that, notwithstanding the agent had exceeded his authority, the deed should be given the effect of a quit claim deed; and was void only as to the warranty. In *Yost* v. *Ramey*, 103 Va. 117, it was held, (syl. pt. 2), that: "Where an attorney in fact is authorized to sign his principal's name, as surety for an executor, to the 'bond required by the court' of the executor, and he signs the name to such bond, which contains some provisions not required by law, which conditions are severable and void, this is not in excess of the attorney's powers, and his principal is bound."

The notes in question are not rendered void by the provision authorizing any attorney-at-law to confess judgment on them. The unauthorized provision only is void.

At the time these notes were negotiated to the Merchants & Manufacturers National Bank, certificates of deposit, bearing three per cent interest, were given to Benedum and Fox, respectively, amounting in the aggregate to $40,000, payable when the notes themselves became due. The notes bore six per cent interest. It is argued that this transaction indicates a suspicion on the part of the bank that the notes were defective. We do not think so. Benedum and Fox represented to it that the transaction with Englehard was a cash one, and that they could use the certificates of deposit as cash; and the bank saw a chance to make three per cent in a legitimate manner. But even admitting that the bank was suspicious of the notes, mere suspicion is not enough; the bank is, nevertheless, to be considered a *bona fide* holder, in the absence of actual or constructive knowledge of any defect in the notes. *Bank* v. *Ohio Valley Furniture Co.,* 57 W. Va. 625. The certificates of deposit were negotiable, 2 Daniel on Negotiable Instruments, sec. 1703, and authorities cited in note, and had been indorsed by Fox and Benedum, respectively, to innocent holders. The bank was, therefore, in the same situation as if it had paid the cash. It was bound to redeem its certificates.

Granting that the rule of law is, that proof of such facts by

the maker of negotiable notes, as would render it uncollectible in the hands of the payee, casts the burden upon the indorsee to prove that he is a holder for value and without notice, still we think this burden is discharged by the plaintiff bank in this case. It proved that it purchased the notes before due, and paid value therefor, and that it had no knowledge of any fraud, or of any facts which burdened it with the duty to make any further investigation in regard to the execution of the notes than it did make.    The power of attorney from which we have quoted was filed for record in the recorder's office of Franklin county, Ohio, on the 9th of June, more than a month before these notes were executed; and it appears that, before discounting the notes, an officer of the bank inquired of the recorder concerning the power of attorney.    But it matters not whether the bank's officers actually saw the power of attorney.    They had a right to rely upon the representation that such power of attorney existed, and while their failure to examine further into that matter might, in a proper case, be evidence of negligence of official duty, it still would not be evidence of bad faith. There is no evidence which imports an intent on the part of the bank to do wrong.    Benedum and Fox, it is true, were residents of West Virginia, but they were both officers in the First Citizens Bank; and it is very natural that the officers of another bank, having business relations with their bank, should trust their representations.

It appears that there were two papers executed by Mr. Bryan giving power of attorney to his son-in-law, designated in the record and in briefs of counsel as No. 1 and No. 2; and that the second one, although bearing the same date as the first, to-wit, 5th March, 1903, and purporting to be acknowledged before a justice of the peace in Pennsylvania on the same date, yet which was, in fact, signed and acknowledged sometime in June, 1903. Loller claims to have had no knowledge of this second paper, and Mr. Bryan swears that A. E. Fox induced him to give it, by fraudulent representations.    There is conflict between Fox and Loller, as to whether the latter actually knew of it or not. But we do not regard it material whether he knew it or not. Because he evidently executed the notes thinking he had power to do so, and the power having been given before the notes were

made and discounted, the bank could rely on either, or both, of the writings. There was nothing to put it on enquiry concerning the fraudulent procurement of the second writing; and it can not be affected thereby. It may be that the first writing conferred power upon Loller to execute the notes in question, as well as the second. But it is unnecessary to decide this, inasmuch as the bank had a right to rely upon the second and seems to have done so.

The chancellor denied relief to the City Bank of Wheeling, not because of any knowledge, actual or constructive, of fraud in the making of the notes, but on the ground that Loller was not authorized to execute notes for any other purpose than in payment for shares of stock in corporations, and that the notes held by this bank were not executed for that purpose. He also held that, if the bank had been diligent to inquire, it could have ascertained that the notes were executed simply to be placed upon the market and sold. But we do not think this view is sustained by the record. We think the proof fully establishes the fact that the $30,000 of notes held by this bank were given in consideration for stock in the Loller Manufacturing Company. They are a part of the $50,000 of notes executed 10th June, 1903, payable to the order of that company. Upon their execution Bryan became entitled to the stock, and the company to the notes; neither was it restricted in the use which it could make of them. It had a right to sell them. They were negotiated to the City Bank after being indorsed by the payee and by the First Citizens Bank. And the City Bank is as much an innocent holder of these notes as either of the other two banks are of the notes which they hold. The same reasons for holding the First Citizens Bank to be an innocent holder of the $20,000 notes applies to sustain the title of the City Bank to the $30,000 of notes. They are notes of the same class.

It is suggested that Fox, as Treasurer of the Loller Manufacturing Company, was not shown to have authority to negotiate the notes, but that is a question between that company and the holder of the notes, and it is not complaining. It was made a party defendant in both the suit by the City Bank, and in the suit by the First Citizens Bank, and it failed to answer either bill. Both bills allege that, before the notes were due and

payable they were indorsed and transferred by the Loller
Manufacturing Company to the First Citizens Bank, and by it to
the other banks, respectively, and its failure to deny those alle-
gations must be taken as an admission of the treasurer's
authority to indorse the notes, or as a ratification of his act.
Moreover, it appears that the funds derived from the sales of
these notes were placed to the credit of said company in the
First Citizens Bank, and were checked out by it. It would,
therefore, be estopped to deny the authority of its treasurer to
make the transfer of the notes; and certainly no one else is in
a position to complain, if the corporation directly affected is
not.

It is insisted that there is a fatal variance between the descrip-
tion given in the bill filed by the First Citizens Bank, as to
two of the notes sued on, and the notes offered in evidence. The
bill describes the $2,000 note as being payable at the Middleport
*National* Bank, whereas the note offered in proof shows that it is
payable at the "Middleport Bank." The note for $3,000 is de-
scribed as having been signed "by W. J. Bryan by S. W. Loller
his attorney in fact," whereas the note offered in proof appears
to be signed by W. J. Bryan in person. The bill purports to ex-
hibit these notes along with it, but as a matter of fact they ap-
pear to have been filed with depositions. It is a well established
principle, both in courts of law and in courts of equity, that the
*allegata* and *probata* must correspond. 13 Enc. Va. & W. Va.
478, and numerous cases cited. If the variance is so material as
to make the case proven wholly different from the one alleged
in the pleadings, relief can not be given. *Campbell* v. *Bowles,*
13 Grat. 652; *Grigsby* v. *Weaver,* 5 Leigh 197; *Doonan* v. *Glynn,*
26 W. Va. 225; *Bier* v. *Smith,* 25 W. Va. 830. The variance in
this instance is not so great, however, as to show that the cause
proven is wholly different from the cause alleged, and it is unnec-
essary to decide whether the variance is so material as to require
an amendment of the pleadings to cure it, if application therefor
had been made at the proper time, because of another rule of
practice which we think should be applied in this case. That is,
if advantage of a variance between the proof and the pleadings is
not taken in some manner in the court below, and that court's at-
tention is not called to the question, it can not be raised for the

first time in this Court. It will be considered as waived. There was no exception taken to the deposition of A. E. Fox who filed the note as a part of his deposition, and no exception to the introduction of the note. It is now too late to raise the objection. Plaintiff was entitled to an opportunity to amend its bill, in the event its evidence had been excluded for a variance. *Hill* v. *Proctor,* 10 W. Va. 59; *Vanscoy* v. *Stinchcomb,* 29 W. Va. 263; *Long* v. *Perine,* 41 W. Va. 314.

W. J. Bryan and wife conveyed to his daughter, Lizzie B. Loller, wife of S. W. Loller, 474 acres of coal land in Marion county, West Virginia, for a cash consideration, recited in the deed, of $20,000. The bills attack that deed on the ground that it was made with intent to hinder, delay and defraud plaintiffs, and the other creditors of W. J. Bryan, in the collection of their debts. W. J. Bryan in his answer, denies the fraud, but Mrs. Loller makes no answer to the bill. The deed bears date April 3, 1903, and the certificate of acknowledgment of D. H. Brewer, a justice of the peace in Pennsylvania, purports to have been made on the same date. But it is proven by Thomas B. Anderson, who was present when the justice drew up the deed and certified the acknowledgment, that the deed was written, signed and acknowledged on the 12th of October, 1903. Mr. Bryan admits it. It is also proven by Mr. Jacobs, clerk of the county court of Marion County, that the date in the certificate of acknowledgment had been changed before the deed was presented for recordation; that the abbreviation "Apr." had been changed to "Oct.", and the figure 3 was written over the figures "1 and 2." Mr. Anderson remained at Mr. Bryan's house the night following the evening the deed was executed, and he testifies that, after the deed had been signed and acknowledged, it was left lying on the table, and he did not know what became of it that night; that on the next morning it was delivered to him by Mrs. Loller to be carried to Fairmont, West Virginia, for recordation; and that he was not aware that any change had been made in the date of the certificate. There was certainly opportunity for someone at Mr. Bryan's house to have made the change that night. Mr. Bryan testifies that the deed was made pursuant to a written contract of sale between himself and daughter, made on the 3rd of April, 1903, and that the deed was drawn up to conform to

this written agreement as to its date. He is corroborated in respect to that by Mr. Anderson, who says he heard Mr. Bryan and the justice discussing some such contract, and heard the justice tell him that the deed should be drawn according to the contract. But no reason appears why the justice should have certified to a false date, if such was the contract. The justice is dead, and his testimony was not taken. The contract of sale is not in the record. The deed makes no reservation of royalty accruing from the coal operation on the land, and Bryan collected royalties monthly, up to 1st September, 1903. The Fairmont Coal Company received its first notice to pay royalties to Mrs. Loller on the 14th of October, 1903, which appears to have been before the royalties for the month of September were payable. In this notice, given by W. J. Bryan, he states that he had sold the property to his daughter about the first of April, 1903, but that he had reserved the royalties until the first of September. There appears to have been no notice to plaintiffs of this sale, either actual or constructive, until the recordation of the deed on the 13th October, 1903, long after all the debts sued on had been contracted. Mrs. Loller made her home with her father in the country, on his farm in Pennsylvania, and his testimony as to how his daughter accumulated the $20,000, which she paid him for this valuable property, is very unsatisfactory. He supposes she made it by managing his farm, which he permitted her to do. It also appears that, some time after this pretended sale, Mr. Bryan had loaned to his daughter $5,000, to be used by her husband for the benefit of the plant at Middleport, Ohio, which was then being operated by the Loller Manufacturing Company, and that he held her note for that sum when his testimony was taken. Mrs. Loller has not given the court the benefit of her testimony. Mr. Bryan's testimony concerning the disposition he made of the $20,000, which he says his daughter paid him, is also very unsatisfactory. The property conveyed is proven to be worth from $250,000 to $300,000. It was yielding in royalties on coal then being mined from it, by the Fairmont Coal Company, from $2,-000 to $2,500 per month. The last report filed in this suit by that company shows that there was in its hands, at that time, royalties which had accrued pending this suit, amounting to $167,-417.50. The royalties, for one year only, is more than the con-

sideration claimed to have been paid for the entire property. That is a consideration so small as to shock the moral conscience, and is evidence of fraud. *Bierne* v. *Ray,* 37 W. Va. 571; *Wood* v. *Harmison,* 41 W. Va. 376. While it is true that the relationship of the parties is not, of itself, a badge of fraud, yet close relationship between parties to a conveyance, which is attacked on the ground of fraud, is a matter to excite suspicion, and requires a less amount of proof to establish the fraud than if the transaction were between strangers. *Bierne* v. *Ray, supra; Knight* v. *Capito,* 23 W. Va. 629; *Colston* v. *Miller,* 55 W. Va. 490. When this deed was executed, there were notes outstanding against Mr. Bryan aggregating nearly $200,000, $90,000 of which he had himself executed and delivered to Englehard. Finding himself in this embarrassed situation he attempts to convey the bulk of his property, worth at least $300,000, to his daughter in consideration of $20,000. The deed having been attacked as fraudulent, the burden was upon the grantee to prove that the consideration was adequate, and that it was paid. *Bank* v. *Danser,* 70 W. Va. 529. Yet Mrs. Loller takes so little interest in the matter as not to give her testimony. We have no hesitation in pronouncing the conveyance fraudulent in law, and void as to the attaching creditors. Mr. Bryan no doubt felt that he had been greatly wronged by Fox and his associates, in whom he seems to have had childlike confidence. He was well stricken with years, and, realizing that he had not much longer to live, he was actuated by a strong desire to make provision for his own child rather than let his property fall into the hands of those who had defrauded him. There is much to be said in palliation of his act. We do not adjudge him guilty of a moral wrong. But the rules of law are inflexible. The banks are innocent holders of the notes which were executed either by Mr. Bryan or by his authorized agent, and put into circulation, and it is essential to the commercial life of the country that the law should preserve inviolate the rights of innocent holders of commercial paper. The banks have parted with their money, and they are as innocent of wrong as Mr. Bryan. It was he, and not they, who made the innocent mistake of entrusting power in the hands of those who have used it to his hurt; and it is he, and not they, who must suffer the consequences.

The decree of the circuit court will be reversed, and a decree entered here setting aside the conveyance from W. J. Bryan to Mrs. Lizzie B. Loller in so far as it interferes with the rights of plaintiffs in the collection of their debts, and decreeing in favor of each of said plaintiffs against the several defendants to their respective bills, who are liable on the notes sued on, for the respective amounts thereof with interest; and decreeing said debts to be liens upon the funds in the hands of the Fairmont Coal Company due the estate of W. J. Bryan, deceased, in the order of the service of garnishment process upon it; and the cause will be remanded for the enforcement of such order, and for such further proceeding as may be necessary to the administration of the relief here granted.

*Reversed and Remanded.*